617 A.2d 1154

**In re JOSHUA W., Aaron W., Jonathan W., and Rachel W.**

**No. 422, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Jan. 8, 1993.

488

Richard R. Wingard, Jr., Dunkirk, for appellant.

Shelly E. Mintz, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before BISHOP, CATHELL and MOTZ, JJ.

MOTZ, Judge.

Mr. W. and his estranged wife, Mrs. W., were married in September 1972 and have six children—Jonathan, Joshua, Sarah, Aaron, Rachel, and Eric. Because of allegations of suspected child abuse and neglect, these children, ranging in ages from almost 5 to 20 years, were adjudicated children in need of assistance ("CINA") pursuant to Md.Code Ann. Cts. & Jud.Proc. § 3-801(e) and placed under protective custody several years ago; the CINA adjudication is not

challenged here. Most of the children—Jonathan, Joshua, Sarah, Aaron, and Rachel—have spent substantial periods in foster care.[1] Only Eric, the oldest, has continually lived at home. Mr. W. and Mrs. W. are currently separated and seeking a divorce.

On February 10, 1992, the Circuit Court for Anne Arundel County held a hearing in the respective CINA cases of these children to determine if Mr. W. and Mrs. W. should pay support for Jonathan, Joshua, Aaron, and Rachel to the Anne Arundel County Department of Social Services ("DSS"). After giving the parents an opportunity to be heard, the court ordered Mr. W. to pay $300.00 per week to DSS beginning February 10, 1992 on behalf of Jonathan, Joshua, and Aaron; child support was not ordered on behalf of Rachel, presumably because she is now living with her mother.

The court did not order Mrs. W. to contribute toward child support of the children. Mrs. W. testified that she lives with her daughter Rachel and a boarder and rents a house for approximately $510 per month. In July 1991, Mrs. W. began working part-time in the laundry department of the Naval Academy; she earns $8.34 per hour. Her job provides no benefits and her work hours are limited because of her need to attend and transport her children to court-

---

1. Rachel (born March 21, 1975), Aaron (born December 26, 1976), and Joshua (born July 24, 1986) were initially placed in the protective custody of the Calvert County Department of Social Services in 1988. Their cases were subsequently transferred to the Anne Arundel Department of Social Services and they were placed in foster care in March 1989. Sarah (born September 23, 1981) was also placed in foster care in March 1989. Sarah's case is not part of this child support action because DSS holds guardianship of Sarah with the right to consent to adoption. Jonathan (born January 1, 1988) was placed in foster care in October 1990. Mr. W. in his appellate brief stated that all children, except Aaron, were returned home as of July 31, 1992. The record only reflects matters through June, 1992 and indicates that, at least at that time, all of the children, except Rachel and Eric (born September 29, 1972), were in foster care and that Rachel was living with her mother and Eric with his father. At oral argument, Mr. W. conceded that at least two children were still in foster care; he has yet to pay DSS any amount for their support.

ordered therapy sessions. Mrs. W. is looking for another part-time job to supplement the laundry job or a full time job with more flexible hours. According to Mrs. W., Mr. W. does not contribute any financial support to her or their daughter Rachel. On the basis of this testimony and Mrs. W.'s financial statement, the trial court decided not to order her to make any contribution to DSS to cover the support of her children, but did order her to furnish, on a bi-monthly basis, a statement of income and expenses as well as report on the status of her efforts to obtain other employment. No party appeals from the order regarding Mrs. W.

The focus of this appeal, then, is only on whether the circuit court erred in ordering Mr. W. to reimburse DSS for the support of Jonathan, Joshua, and Aaron. In his *pro se* appeal, Mr. W. raises the following questions:[2]

1. Did the trial court err in determining that Mr. W. had voluntarily impoverished himself and thus in ordering him to pay child support?

2. Did the trial court abuse its discretion in ordering Mr. W. to pay $300 per week from February 10, 1992 in child support to the Anne Arundel County Department of Social Services?

(i)

As a preliminary matter, we deny the State's motion to dismiss this appeal. The State urges dismissal because

---

**2.** Mr. W. actually stated the questions as follows in his appellate brief:
1. Is there legislation on the books which permits DSS to recover costs of foster care services from natural parents?
2. Is there legislation on the books which states how the recovery of costs should be accomplished?
3. Is there legislation on the books which defines how much money and at what rate it is to be paid by the natural parents?
4. Is there legislation on the books which defines voluntary impoverishment?
5. Did Mr. W. voluntarily impoverish himself?
We have consolidated these questions and recast them to reflect the heart of his appeal. Mr. W.'s fourth and fifth questions are addressed in part (ii) of this opinion; the others are addressed in parts (iii) and (iv).

Mr. W. failed to comply with the requirements of Maryland Rules 8–501(c) and 8–503(b). There is no doubt that Mr. W. violated a number of procedural rules. We do not sanction this; even *pro se* litigants are to obey these rules. Dismissal of an appeal for nonconformity with these rules is, however, discretionary. *See* Md.Rule 8–501(*l*) (1992); Md. Rule 8–503(g) (1992). In this case, because of the already protracted litigation and because it is child support that is at issue, we decline to exercise our discretion to dismiss the appeal. *See Tannehill v. Tannehill*, 88 Md.App. 4, 10–11, 591 A.2d 888 (1991).

### (ii)

 Mr. W.'s first challenge concerns the trial court's factual finding that Mr. W. voluntarily impoverished himself. Giving due regard to the trial court's opportunity to judge the credibility of the witnesses, we will not disturb its factual findings unless clearly erroneous. Md.Rule 8–131(c) (1992). Although not explicitly defined in the Maryland Code, "voluntary impoverishment" is not a new concept for this Court. With this term, we recognize that parents may at times take steps to avoid their obligation to pay child support. As Judge Rosalyn Bell carefully explained in *John O. v. Jane O.*, 90 Md.App. 406, 421, 601 A.2d 149 (1992), "voluntarily impoverished" means "freely, or by an act of choice, to reduce oneself to poverty or deprive oneself of resources with the intention of avoiding child support or spousal obligations." *See also* 24 Am.Jur.2d *Divorce and Separation* § 662 (2d ed. 1983).

Mr. W. argues that he "did not voluntarily reduce nor deprive himself of resources" with the intention of avoiding his child support obligation. In support of his position, he maintains that he

did not quit a salaried job or voluntarily terminate any other source of income ... [; he] did not dispose of or hide any assets ... [; and he] has consistently sought

appropriate work and is currently being considered for 8 positions.[3]

The trial court heard extensive testimony from Mr. W., himself, regarding his educational and employment history, financial status, and ability to contribute child support. Mr. W. testified that he has an undergraduate degree in early childhood education; he was certified to teach but allowed his teacher certification to lapse two years ago. Since January 1991, he has been attending graduate school in "counseling psychology;" he anticipates receiving a Masters degree in May 1992 and beginning a Ph.D. program in the fall of 1992. In addition to his academic schedule, he volunteers 20 hours per week at Crownsville Hospital Center doing patient assessments; this volunteering is not required for a degree but does "count" toward the two years supervised work experience needed for counseling certification.

Mr. W. further testified that he was unable to work full time in 1991 because of "health and time concerns"; specifically, he was suffering from a "bad case of the nerves" and an old back injury. (While having a 10% partial disability of the back, Mr. W. has not had his back re-evaluated for several years.) With respect to time concerns, Mr. W. testified that he maintained a 12 credit per semester academic schedule during 1991 and also had to contend with

---

**3.** Mr. W. also contends that, prior to the February 10, 1992 hearing, he did not know he had an obligation to reimburse DSS for child support and, therefore, could not have intended to avoid his child support obligation. If Mr. W. had so testified below, the circuit court could certainly have determined that such testimony was not credible. Presumably any parent, particularly one of Mr. W.'s education and sophistication, understands that he has an obligation to support his children. *See* Md.Code Ann.Fam.Law § 10–203 (1991); Md.Code Ann.Cts. & Jud.Proc. § 3–830 (1989). In fact, Mr. W. did not make this argument in the court below. (There, he simply maintained that his volunteer work at Crownsville, and the fact that his children had not been educated in public schools, indicated that he was not a "deadbeat" or "self-willfully impoverished.") Accordingly, it is not preserved for review. Md.Rule 8–131(a) (1992).

the time pressures of scheduling visitation with his children, court dates, and foster care review board hearings.

Prior to beginning graduate school in January 1991, Mr. W. worked as a car salesman. He quit this job in October 1990 because he said he became too upset to work after DSS took his children from him. He has not worked in a full time paid job since then. He testified that he financed graduate school and supported himself in 1991 through student loans and loans from family and friends; he has lived with his parents since 1988 and does not pay them rent. He further testified that he had purchased a car in September, 1991, and a computer in August, 1991.

In the past Mr. W. worked as a pastor and as a technical writer. He earned approximately $25,000 to $30,000 annually from his work as a pastor, combined with some part-time work in the remodeling business. The last time he worked as a technical writer was in 1987 when he had a $7,000 contract with the National Weather Service. At the time of the hearing, Mr. W. claimed to be self-employed in the remodeling business; he testified that he earned $12.50 per hour and worked approximately 30 hours per week, for a total of $375.00 a week. Finally, Mr. W. testified that he was actively seeking full-time employment, but, upon questioning, conceded that he had not sought employment for a large number of positions for which he would seem to be qualified. He planned to attend school at night (for the doctorate degree) and work full-time during the day. He estimated that he has an earnings potential of at least $25,000 to $30,000 per year and claimed that he expected to earn that amount beginning the Fall of 1992.

After hearing Mr. W.'s testimony, the trial court determined that Mr. W. had voluntarily impoverished himself to avoid having to pay child support. The court explained:

Mr. W. ... has chosen not to work ... intentionally chooses not to work in order to go to school. He can come up and find funds in order to buy an automobile when he wants to do that, find funds in order to go to school, he can find funds to do those kinds of things. He

has done nothing that I can find from his testimony of any substance to make any efforts to get a job.... I don't believe most of what he says about his applications for jobs and things of that nature on the basis of his demeanor on the witness stand and some of the answers that he's given. In any event he feels that he can get a job.... I feel that Mr. W. ... is certainly capable of earning twenty-five to thirty thousand dollars.... Mr. W ... is making by his own admission three hundred and thirty dollars ($330.00) a week currently and he is volunteering his time so he can get certification.

■ The trial court was not clearly erroneous in making this finding. Much of Mr. W.'s testimony focused on the various factors that a court may consider when determining whether someone has voluntarily impoverished himself. *See John O., supra,* 90 Md.App. at 422, 601 A.2d 149 (factors to consider include: current physical condition; level of education; timing of any change in employment or other financial circumstances; efforts to find and retain employment; past work history; and "any other considerations presented by either party"). A fact finder could well conclude, upon consideration of this testimony, that Mr. W. had voluntarily impoverished himself.

### (iii)

■ Before we turn to the final question for review—whether the trial court abused its discretion in ordering Mr. W. to pay $300 per week in child support to DSS—we must determine whether the trial court was obliged to use the child support guidelines as set forth at Md.Code Ann.Fam. Law §§ 12–201 through 12–204 (1991, 1992 Cum.Supp.). The trial court, in this CINA case, acted pursuant to Md. Code Ann.Cts. & Jud.Proc. § 3–830 (1989) in ordering Mr. W. to support his children. Section 3–830 provides in its entirety:

**Parents liable for support after commitment.**

After giving the parent a reasonable opportunity to be heard, the court may order either parent or both parents

to pay a sum in *the amount the court directs to cover the support of the child in whole or in part.*

(emphasis added). There is nothing in this language that indicates, or even suggests, that the amount a court "directs" a parent to pay to cover the support of a CINA child is limited by the child support guidelines. Nor does the legislative history of Cts. & Jud.Proc. § 3–830 in any way indicate that a juvenile court's authority pursuant to it is limited by the guidelines. Section 3–830 was enacted, in its present form, however in 1975, *see* 1975 Md.Laws, Chap. 554, §§ 1 and 3, and this was, of course, well before the initial enactment of the child support guidelines in 1989. *See* 1989 Md.Laws, Chap. 2.

The guideline legislation does specifically provide, in pertinent part, that "in *any proceeding to establish or modify child support,* whether pendente lite or permanent, the court *shall* use the child support guidelines set forth in this subtitle." Fam.Law. § 12–202(a) (emphasis added). This case, however, is not like most actions for child support. Most child support actions involve a suit by a custodial parent against a noncustodial parent for child support and are brought in response to the separation or divorce of the parents. In contrast, this case involves two noncustodial parents and a third party, the Anne Arundel County Department of Social Services. The circuit court did not order Mr. W. to pay support to Mrs. W. but rather ordered Mr. W. to pay child support to DSS for reimbursement of the cost of foster care provided to Jonathan, Joshua, and Aaron. *See* COMAR 07.02.11.26A. (parental support is considered in determining the amount available for the reimbursement of the cost of foster care). Indeed, DSS had a duty to seek reimbursement for the cost of foster care. *See* COMAR 07.02.11.26C. Also, while Mr. and Mrs. W. are seeking a divorce, their marital separation is not the reason why Jonathan, Joshua, and Aaron were placed in foster care; they were placed in foster care because of suspected child abuse and neglect.

The guidelines, as the Court of Appeals recently explained in *Voishan v. Palma*, 327 Md. 318, 609 A.2d 319 (1992), were developed in accordance with the Income Shares Model, a method of calculating child support "based on estimates of the percentage of income that parents *in an intact household* typically spend on their children." *Id.* at 322–23, 609 A.2d 319 (emphasis added). *See also* Robert G. Williams, "Child Support Guidelines: Economic Basis and Analysis of Alternative Approaches," *in* 1 *Improving Child Support Practice* 1, 12–13 (A.B.A.1986) ("Williams"). Thus, the Income Shares Model does not seem to address situations where the child is placed in foster care with neither parent having physical custody of the child. Other models of calculating child support also focus on the typical child support situation with one custodial parent. For example, the Wisconsin Percentage of Income Standard "assumes that each parent will expend the designated proportion of income on the child, with the custodial parent's proportion spent directly." Williams, *supra*, at 11. The Washington Uniform Child Support Guidelines Model is similar to the Income Shares Model except it adjusts child support orders based on age of the children. *Id.* at 19. The Cassetty Model, an income equalization standard, was developed to ensure that children "continue to enjoy a standard of living which is as close to the original pre-divorce level as possible." *Id.* at 26. This model redistributes income in excess of a poverty level amount between the two households in proportion to the number of persons in each family unit. *Id.* Only the Delaware Melson Formula seems to lend itself to situations in which there are two noncustodial parents. This model is premised on allowing parents to retain sufficient income for their most basic needs. Parents are not "permitted to retain any more income than that required to provide ... for their own self-support." *Id.* at 20. Furthermore, "children are entitled to share in any additional income so that they can benefit from the absent parent's higher standard of living." *Id.* Like the other models, however, the Delaware model eventually returns to

a discussion of custodial and noncustodial parents and how the child's support needs are allocated between them. *Id.* at 24.

The language of the child support guidelines similarly does not directly address the situation involved here. The guidelines discuss dividing the basic child support obligation and other expenses between the parents with the "noncustodial" parent owing the support obligation to the "custodial" parent. *See* Fam.Law § 12–204(g)–(i), (k)-(*l* ). Furthermore, the guidelines refer only to cases of sole custody and shared physical custody.[4] *See* Fam.Law. § 12–204(k) (for cases other than shared physical custody cases, "[t]he *custodial parent* shall be presumed to spend that parent's total child support obligation directly on the child or children" and the noncustodial parent shall owe the child support obligation to the custodial parent) (emphasis added); Fam.Law. § 12–204(*l* ) (instructions for shared physical custody cases).

Despite this emphasis on custodial and noncustodial parents and sole and shared physical custody in the guidelines, there is nothing in the statute or its legislative history to suggest that the General Assembly intended that the child support guidelines *only* be applied to the usual child support cases. Nor does DSS so argue. Rather, as noted above, Fam.Law § 12–202(a) expressly provides that the guidelines "shall" be used "in *any* proceeding to establish child support." (emphasis added). Moreover, through this statute the General Assembly appears to encourage courts

---

**4.** Sole custody involves one parent having physical custody of the child or children. The other parent, or "noncustodial" parent, exercises no physical custody over the child or children except for whatever visitation rights are involved. Shared physical custody means that "each parent keeps the child or children overnight for more than 35% of the year and that both parents contribute to the expenses of the child or children in addition to the payment of child support." Fam. Law. § 12–201(i). The language of the statute as originally proposed also included instructions for cases of split custody, which involves each parent having physical custody of at least one child. The split custody designation was eliminated from the legislation in its final passage. *See* 1989 Md.Laws, Chap. 2.

to maintain guideline principles even in situations where actual application of the guidelines "would be unjust or inappropriate." Fam.Law § 12–202(a)(2)(iv)(1). *See Voishan, supra,* 327 Md. at 329–31, 609 A.2d 319 (guidelines do not cover all situations, *e.g.,* cases involving incomes over $10,000 per month; however, "we also do not believe that the legislature intended that the principles from which the schedule was derived should be ignored when a judge exercises discretion" when ordering child support).

The conclusion that the guidelines are to be used in all child support cases including those, like that at hand, involving no custodial parent and payment to the State for foster care, is further supported by the fact that these guidelines were created in response to federal legislation, the Child Support Enforcement Amendments of 1984. *See* 42 U.S.C. §§ 651–669 (1991); 45 C.F.R. § 302.56 (1991); *see also* State of Maryland, Senate Judicial Proceedings Committee Bill Analysis for Senate Bill 49, 1989 Session (1989). This legislation represented a major effort on the part of the federal government to reform state child support enforcement programs. The Senate Committee on Finance noted that "[t]housands of unserved child support warrants pile up in many jurisdictions and often traffic cases have a higher priority." S.Rep. No. 98–387, 98th Cong., 2nd Sess. 1, 5 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2397, 2401. Accordingly, new federal legislation was enacted

> [f]or the purpose of enforcing the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such child or children are living, locating absent parents, establishing paternity, *òbtaining child support* and spousal support ...

42 U.S.C.A. § 651 (emphasis added). In addition to requiring states to improve child support enforcement activities by withholding tax refunds and requiring bond postings from parents who are delinquent in their payments, etc., this legislation also required "[e]ach State, as a condition for having its State plan approved under this part, ... [to] establish guidelines for child support award amounts within

the State." 42 U.S.C.A. § 667(a). *See also* 45 C.F.R. § 302.56(a) (states are required to "establish *one* set of guidelines by law or judicial or administrative action for setting and modifying child support award amounts within the State.") (emphasis added).

Furthermore, this federal legislation specifically attempted to stem the growing number of families and children dependent on federal programs like Aid for Families with Dependent Children ("AFDC"), *see generally* S.Rep. No. 98–387 and H.R.Conf.Rep. No. 98–925, 98th Cong., 2nd Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. 2397, by conditioning continued federal funding for AFDC and state child support enforcement efforts on a state's adoption of a comprehensive support enforcement plan, one component of which is the development of child support guidelines. *See* 42 U.S.C.A. § 658; *see also* S.Rep. No. 98–387, *supra*, at 24, *reprinted in* 1984 U.S.C.C.A.N. at 2420. Providing this "penalty" for noncompliance with the federal legislation illustrates the federal government's concern regarding the financial burden it and the states were bearing in taking care of children of absent or noncustodial parents who were not contributing towards child support. Such a penalty obviously encourages a state's efforts in enforcing child support laws in all cases and, in particular, in cases like that at hand, in which child support is sought from parents whose children are placed under government financed care.

The regulatory history of the current foster care regulations also supports this conclusion. Prior to the promulgation of the regulations currently in effect, the local departments of social services were required to "provide the court with an assessment of the parent's financial capacity to pay support in line with Schedule A of Regulation .19." *See* 4:17 Md.Reg. 1307 (1977); 5:3 Md.Reg. 136 (1978). Schedule A mandated a specific rate of payment. In 1989, the State Department of Human Resources repealed these regulations and adopted, as an emergency measure, new regulations to update Schedule A. *See* 16:4 Md.Reg. 500, 514 (1989). The emergency status of these new regulations

expired in June 1990, before they were adopted as permanent regulations. Shortly thereafter, the Department proposed the regulations that are the ones in effect today. *See* 17:15 Md.Reg. 1871 (1990); 17:25 Md.Reg. 2904 (1990). Under the present regulations, the language regarding Schedule A is eliminated and in its place is a general directive that the local department of social services "initiate support action by furnishing information regarding the child's parents to the Child Support Enforcement Agency (CSEA), which will undertake child support enforcement action for all foster care cases." *See* COMAR 07.02.11.26F. Having thus abandoned the rates set forth in the original Schedule A, in favor of general language directing DSS to initiate support action, the Department indicated that child support sought by DSS as reimbursement for foster care was to be calculated in accordance with the child support guidelines set forth in Fam.Law §§ 12–201 through 12–204.

All of these factors lead us to conclude that the General Assembly intended that these child support guidelines be used in all child support cases, including those, like the one at hand, involving government financed child care and no custodial parent.

### (iv)

Given that the guidelines are to be used in cases like this, we turn to the final question *i.e.* whether the trial court abused its discretion in ordering Mr. W to pay $300 per week in child support to DSS. The trial court's actual conclusion as to whether the guidelines were to be applied in this case is somewhat equivocal:

> I do not believe the guidelines specifically apply in this situation. I think they are helpful in some ways because certainly they deal with child support issues and it does deal with in all matters, for instance, in all kinds of matters and I don't know that they specifically do apply here because as has been suggested it's more a case of, you know, what one person's obligation is versus another

person meaning the parents of the child or the children. They are helpful in talking about some things....

■ Even if this statement is interpreted as a finding that the guidelines are inapplicable to situations like that at hand, reversal would not be required if the trial court made the specific additional findings necessary to justify departure from guidelines. Although there is a "rebuttable presumption that the amount of child support which would result from the application of the child support guidelines" is the "correct amount", if a court finds "application of the guidelines would be unjust or inappropriate," it may depart from them. Fam.Law § 12–202(a)(2). If it does so, however, it must make "a specific finding on the record stating the reasons for departure" and that finding must include the following specific statements:

 A. the amount of child support that would have been required under the guidelines;

 B. how the order varies from the guidelines;

 C. how the finding serves the best interests of the child; and

 D. in cases in which items of value are conveyed instead of a portion of the support presumed under the guidelines, the estimated value of the items conveyed.

*Id.* If the trial court fails to make these specific findings its order must be vacated. *Tannehill, supra,* 88 Md.App. at 15, 591 A.2d 888.

Here the trial court had no obligation to make the fourth finding, concerning the estimated value of items conveyed, because that finding was inapplicable to this case. The trial court did attempt to make the first and second findings but it totally failed to make the third finding.

As to the first finding, the amount of child support that would have been required under the guidelines, it found that under the guidelines Mr. W. would be potentially liable for $965 "on a monthly basis" for the support of four children if Mrs. W.'s earnings were included. This figure is apparently based on the circuit court's imputation of annual

income of $25,000 to $30,000 to Mr. W., which the circuit court "grossed out" to $2,083 monthly income for Mr. W., and Mrs. W.'s testimony that her monthly income was $885. Thus, the combined adjusted income of the parents, since there was no evidence of pre-existing child support, alimony, maintenance or health insurance obligations, Fam.Law § 12–201(d), was $2,968, which the circuit court properly "rounded up" to $3,000. *Id.* Fam.Law § 12–204(c). What the circuit court failed to do was to consider that Mr. W's *pro rata* share of the combined adjusted income was only 70% and so his child support obligation under the guidelines was only 70% of $965, or $675.50.[5] Since the first finding was inaccurate, obviously the second was inaccurate too. That is, the court could hardly explain how its order varied from the guidelines when it did not correctly assess the guideline requirement.

Finally, and perhaps most significantly, the circuit court totally failed to make the crucial third finding, *i.e.*, how departure from the guidelines serves the best interests of the children. Fam.Law § 12–202(a)(2)(iv). The transcript is replete with instances in which the trial court voiced its frustration with and disbelief of Mr. W.'s testimony. Although we sympathize with the trial court, defer to its assessment of Mr. W.'s credibility, and do not in any way sanction Mr. W.'s conduct, we cannot find any statement, let alone the required "specific finding," by the trial court in which it indicated why it would be in the best interests of Jonathan, Joshua, and Aaron to order Mr. W. to pay child support well in excess of the guidelines amount.

---

**5.** Alternatively, the lower court pointed out that "if you ignore" Mrs. W.'s income, Mr. W.'s obligation would be $751 a month; this is the guideline amount for a parent with an income of $2,100 ($2,083 "rounded up") for four children. The problems with this calculation are that both parents' incomes are to be included and even if Mrs. W.'s income could be disregarded then the court should only have computed the child support for three children ($666), since the fourth child, Rachel, was living with Mrs. W.

■ Certainly DSS and the State benefit if Mr. W. reimburses them as much as possible for the cost of foster care provided to the children. Thus, the trial court acted within its discretion in considering the costs of foster care in its determination of how much child support to order. *See John O.,* 90 Md.App. at 423, 601 A.2d 149 (amount of child support award is governed by the circumstances of the case and entrusted to discretion of trial judge); Fam.Law. § 12–202(a)(2)(iii) (in determining whether application of the guidelines would be "unjust or inappropriate," a court may consider "any direct payments made for the benefit of the children required by ... [court] order"; presumably, this includes DSS payments for court ordered foster care). *See also* COMAR 07.02.11.34 Schedules A and B (these schedules substantiate the trial court's finding that the foster care costs for each of these children were approximately $600 per month, thus the $300 per week (or approximately $1200 per month) award for three children would not even totally cover the foster care costs). Certainly Mr. W. has an obligation to contribute to the support of his children, whether they are in foster care or living with his wife. *See* Fam.Law § 10–203. *See also, Commissioner of Social Services v. Grifter,* 150 Misc.2d 209, 575 N.Y.S.2d 259, 262 (N.Y.Fam.Ct.1991) ("order of support is in the favor of the child ... [a] custodial parent, a foster parent, or the Commissioner of Social Services are (sic) no more than conduits of that support from the non-custodial parent to the child"). Neither of these facts, however, are findings that the best interests *of the child* require a substantial upward departure from the amount that would have been imposed on Mr. W. under the guidelines.

■ At first blush, it would appear that such a finding would be nonsensical in cases in which the support is being paid to the State and not a custodial parent. Upon examination, however, it is clear that a finding that an upward or downward deviation from the guidelines is in the best interests of the child is often possible and relevant even in this situation. When the amount of child support awarded

exceeds the cost of foster care, upon the child's discharge from foster care, the "excess funds ... shall be returned to the child" if the child is at least 18 years old, or if the child is not yet 18 years old "to the legal parent or guardian with whom the child will reside." COMAR.07.02.11.26M. Thus, a substantial upward departure from the guidelines could indeed be justified as in the financial best interests of the child. On the other hand, a downward departure from the guidelines could be justified as in the best interests of a child in foster care if the court found, in the proper case, that such an adjustment was necessary for the parent to obtain the economic stability necessary to regain custody and care properly for the child.

Moreover, in the case at hand, it may be, as the State suggests, that imposing the $300 per week support obligation on Mr. W. is in the best interests of the children because only such a measure will force him into the work place to support them and that support is critical to the children's eventual reunification with their mother, a reunification that is in their best interests. The circuit court, however, made no such finding. We, therefore, vacate the circuit court's order and remand this case so that it may fashion a child support order consistent with the guidelines or make the required specific findings necessary to justify a departure from them. In light of the record in this case, including his total failure to follow our rules, we do, however, impose the costs of this appeal on Mr. W.

MOTION TO DISMISS DENIED. JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY MR. W.