738 A.2d 312

**Brenda J. (Grove) DUNLAP**

v.

**Vincent Charles FIORENZA.**

**No. 1853, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Sept. 30, 1999.

Hollander, J., concurred in part, dissented in part, and filed opinion.

Thomas Ellis, III (Vicki Beth Wolfson, on the brief), Annapolis, for appellant.

William M. Ferris (Krause & Ferris, on the brief), Annapolis, for appellee.

Argued before MOYLAN, HOLLANDER and SALMON, JJ.

MOYLAN, Judge.

Brenda J. (Grove) Dunlap, the appellant/cross-appellee, challenges the determination of Judge James C. Cawood, Jr., in the Circuit Court for Anne Arundel County with respect to the amount of child support she was entitled to receive for the son she parented out of wedlock with Vincent Charles Fiorenza, the appellee/cross-appellant. Dunlap raises four issues for our consideration:

1) Did the trial court err in attributing to her a potential income of $50,000 per year at a time when she was unemployed?

2) Did the trial court err by deviating downward from the Child Support Guidelines by $157 per month?

3) Did the trial court err in failing a) to back date the support order and b) to award her a contribution for the medical and educational expenses she had incurred?

4) Did the trial court err in failing to require Fiorenza to pay at least one-half of their child's private school tuition?

Fiorenza, in his cross-appeal, raises the following issues:

5) Did the trial court err in awarding Dunlap a contribution toward her attorney's fees?

6) Did the trial court err in failing to award Fiorenza income tax exemptions because of his child support payments?

## FACTUAL AND PROCEDURAL BACKGROUND

The parties to this appeal were never married. On September 28, 1984, Justin Fiorenza ("Justin") was born to the parties. In 1987 in the Circuit Court for Prince George's County, Dunlap filed a paternity action against Fiorenza with respect to Justin. Subsequently, both parties entered into a Consent Order whereby 1) Dunlap retained sole custody of Justin and 2) Fiorenza was obligated to pay child support in the amount of $200 per month.

For the next twelve years, Dunlap retained sole physical and legal custody of Justin. During that time, Justin began experiencing difficulties in school as early as the first grade. When Justin was in the fourth grade, he was diagnosed with attention deficit disorder ("ADD"). From the third through sixth grades Justin attended St. John the Evangelist School ("St. Johns"), a private parochial school. Because of his behavioral problems, however, in May of 1996 Justin was asked by school officials not to return to St. Johns at the end of his sixth-grade year.

In the summer of 1996, Dunlap, her minor daughter from a prior marriage (Lauren), and Dunlap's now-husband but then boyfriend, moved from Prince George's County to Anne Arundel County, ostensibly because Dunlap believed she could find a suitable public school for Justin there. Justin was enrolled in Central Middle School for the fall of 1996. Within weeks after school began, however, Justin's teachers complained of his behavior in the classroom. During that fall semester Justin was suspended on a number of occasions.

In October of 1996, Dunlap quit her job of nineteen years as a general manager at a Roy Rogers Restaurant, at least in part to devote more attention to Justin. At the time she left the Roy Rogers Restaurant, she was earning approximately $50,000 per year. Dunlap also withdrew her retirement contributions from her former employer's retirement plan in a single lump sum. After she stopped working, Dunlap picked up her son from school earlier than she had been able to do in

the past and met with his teachers and guidance counselor on numerous occasions.

Justin's behavior, however, did not improve. During the spring semester of 1997, a gun was discovered in his backpack while he was in school. He was accordingly suspended. For the remainder of the spring semester, he received in-home tutoring and was then placed on long-term suspension from all Anne Arundel County schools for at least one additional semester. During that period of home tutoring, Dunlap supervised Justin's progress. Justin underwent counseling sessions with Dr. Robert Marcus of Sheppard Pratt Hospital from February of 1997 until April of 1998.

On June 23, 1997, Fiorenza filed a Petition to Modify Custody.[1] Fiorenza, who was then living in Pennsylvania, sought to have Justin move in with him and to attend school in Pennsylvania. Dunlap opposed the motion.

Dunlap decided that Justin would attend Queen Anne's School, a private school, beginning in the fall of 1997. Given the expense of tuition at Queen Anne's School, Dunlap sought to have Fiorenza's child support payments increased. Accordingly, on September 23, 1997, Dunlap filed a Motion to Modify Child Support.

Justin began showing improvement during the 1997–98 school year (Justin's eighth grade year) at Queen Anne's School. Dunlap continued to maintain close contact with Justin's teachers and she also paid for the entire tuition of the 1997–98 school year and various tutoring sessions. Justin was invited to return to the school for his ninth grade year.

A hearing took place over the course of several days during June of 1998. The focus of that hearing was on the appropriate custody arrangement for Justin. At the time of the hearing, each party had married. Fiorenza had two children by his marriage, whose ages were two years and six months,

---

1. Fiorenza's petition was originally filed in the Circuit Court for Prince George's County. It was transferred to Anne Arundel County because that is where Dunlap and Justin were then domiciled.

respectively. Dunlap also had a nine-year old daughter by an earlier marriage.

On July 14, 1998, Judge Cawood issued an Opinion and Order whereby the parties were granted joint legal custody of Justin. Primary physical custody remained with Dunlap. He ordered Fiorenza to pay increased child support from his former payment of $200 per month to the amount of $400 per month and also to contribute $300 per month toward private school tuition.

## STANDARD OF REVIEW

When presented with a Petition to Modify Child Support, a court may modify a child support obligation at any time if a material change in circumstances has been shown that justifies such a modification. A decision regarding such a modification is left to the sound discretion of the trial court and will not be disturbed unless that discretion was arbitrarily used or the judgment was clearly wrong.

*Moore v. Tseronis,* 106 Md.App. 275, 281, 664 A.2d 427 (1995) (citations omitted); *Tidler v. Tidler,* 50 Md.App. 1, 9, 435 A.2d 489 (1981). Maryland Rule 8–131(c) expressly provides:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

*See In re Joshua W.,* 94 Md.App. 486, 491, 617 A.2d 1154 (1993).

## ATTRIBUTION OF $50,000 PER YEAR EARNING CAPACITY TO DUNLAP

■ Dunlap maintains that Judge Cawood erred in attributing $50,000 of income to her when she was unemployed at the time of trial. In support of her position, she claims that the trial court failed to make an explicit finding of voluntary impoverishment, and, even if it implicitly made such a finding,

it failed to consider the necessary factors when determining voluntary impoverishment. In his Opinion and Order, Judge Cawood explained:

> Mr. Fiorenza makes about $62,000. Mrs. Dunlap makes about $50,000. She stopped work because she felt Justin needed her at home. Since that appears to have helped, we have some sympathy for that position. Unfortunately, were we to apply [that] litmus test, every mother (and some fathers) could stop working because it would be better to raise the children (especially at a younger age). Our world does not permit this. Two income families are the norm, and single parents cannot stay home and take care of the children. We must posit $50,000 to her.

■ Section 12–204(b) of the Family Law Article provides that "if a parent is voluntarily impoverished, child support may be calculated based on a determination of potential income." In *Goldberger v. Goldberger*, 96 Md.App. 313, 327, 624 A.2d 1328 (1993), we elaborated on the concept of voluntary impoverishment:

> [F]or purposes of the child support guidelines, a parent shall be considered "voluntarily impoverished" whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources.

We then, quoting from *John O. v. Jane O.*, 90 Md.App. 406, 422, 601 A.2d 149 (1992), listed ten factors that should be considered by the trial court when determining whether a parent has voluntarily impoverished himself or herself. Included among those factors are 1) whether the party has made efforts to find and retain employment, 2) the party's past work history, and 3) the status of the job market in the area in which the party resides. *See also Moore*, 106 Md.App. at 282–83, 664 A.2d 427. Although the factors must be considered by the trial court, the statute does not require the court to articulate on the record its consideration of each and every factor when reaching a determination of child support. *See Lapides v. Lapides*, 50 Md.App. 248, 252, 437 A.2d 251 (1981)

("The exercise of a judge's discretion is presumed to be correct, he is presumed to know the law, and is presumed to have performed his duties properly.") (Citations omitted). Furthermore,

> [o]nce a parent is found to be voluntarily impoverished, his or her potential income will be "determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels within the community."

*Wagner v. Wagner*, 109 Md.App. 1, 42–43, 674 A.2d 1 (1996)(quoting Md.Code Ann., Fam. Law § 12–201(f)).

In this case, Judge Cawood implicitly found that Dunlap had voluntarily impoverished herself when she quit her managerial position at Roy Rogers. Dunlap herself testified that for the past nineteen years she had worked as a manager at Roy Rogers, supervising various numbers of employees. For the last seven of those nineteen years she had a total income of $50,000 per year. Dunlap additionally testified that she had not investigated the possibility of working part-time and that "[a]s an employee, I would probably be accepted at any Roy Rogers, as an employee working part time for entry level." Finally, during cross-examination she admitted that for many years she had wanted to quit her job to be home with her children but she could not do so because she "didn't have a husband to rely on." Thus, taking all factors into consideration, Dunlap "made a free and conscious choice, not compelled by factors beyond her control," to quit her position at Roy Rogers and forego her annual salary. Based on the evidence produced at the June 1998 hearing, Judge Cawood had adequate support for determining that Dunlap was voluntarily impoverished.

Judge Cawood then went on to attribute an annual income of $50,000 to Dunlap. His determination had support in the record and was, therefore, not clearly erroneous. Dunlap had been steadily employed in a managerial position at Roy Rogers for almost two decades. For the last seven of those years

she had earned approximately $50,000 per year. It was reasonable for Judge Cawood to conclude that Dunlap had a potential earning capacity of approximately $50,000 per year. Considering her recent work history and her qualifications, we decline to hold that Judge Cawood was clearly erroneous in determining that $50,000 was an adequate reflection of Dunlap's potential earning capacity.

## DEVIATION DOWNWARD FROM CHILD SUPPORT GUIDELINES

When determining the proper child support obligation of each of the parents, a trial court is provided with a precise mathematical formula. The use of those Guidelines by a trial court is mandatory. As the Court of Appeals explained in *Wills v. Jones,* 340 Md. 480, 484, 667 A.2d 331 (1995):

> The child support guidelines codified at §§ 12-201 to 12-204 of the Family Law Article provide the method of analysis used to determine the amount of child support awarded in each case. Section 12-202(a)(2) makes the use of these guidelines mandatory unless the result would "be unjust or inappropriate in a particular case." *When a court departs from the child support guidelines, it must make a written finding stating* the amount of support that would have been ordered under the guidelines, how the court's order varies from the guidelines, and *how this variance serves the best interests of the child. Id.*

(Emphasis supplied); *Petrini v. Petrini,* 336 Md. 453, 460, 648 A.2d 1016 (1994)("While the Child Support Guidelines were merely advisory when they were first adopted, their use became mandatory when ch. 58 of the Acts of 1990 was enacted."); *Gates v. Gates,* 83 Md.App. 661, 665-66, 577 A.2d 382 (1990).

The trial judge's computation of the presumptively correct monthly support figure for a single child, pursuant to Family Law Article, § 12-204, was unerring. Fiorenza had a yearly income of $62,000 or $5,167 per month. Dunlap had a potential yearly income of $50,000 or $4,167 per month. The

addition of the two yielded a potential combined monthly income of $9,334. From that combined figure, the basic child support obligation established by the Guidelines would be $1,007 per month.

Fiorenza's decimal fraction of the whole was .55357 and Dunlap's decimal fraction was .44643. $ 1007 multiplied by .55357 yields a product of $557 (forgetting the odd cents). That would be the presumptive amount of monthly child support that the Guidelines would attribute to Fiorenza. The remaining $450 per month of presumptive support would be attributed to Dunlap.

With respect to both parents, however, it must be remembered that those presumptive figures are based on the assumption that a single child will enjoy the undiluted largesse of both of his parents (whatever their relationship may be with each other). In a unified family or a fragmented family, whenever siblings or half-siblings enter the picture, the expectation of the first child is inevitably diminished. That is precisely the basis for the enactment of § 12–202(a)(2), which provides in pertinent part:

(2)(i) There is a rebuttable presumption that the amount of child support which would result from the application of the child support guidelines set forth in this subtitle is the correct amount of child support to be awarded.

(ii) The presumption may be rebutted by evidence that the application of the guidelines would be unjust or inappropriate in a particular case.

(iii) In determining whether the application of the guidelines would be unjust or inappropriate in a particular case, the court may consider:

* * *

(2) the presence in the household of either parent of other children to whom that parent owes a duty of support and the expenses for whom that parent is directly contributing.

■ In this case, Justin's original presumptive expectation has been diminished by the arrival of three younger half-siblings, two on his father's side and one on his mother's side. The inevitable diminution on the mother's side will, to be sure, be informal because it is not the subject matter of a court order. On the father's side, by contrast, it is necessarily reflected in the court order. In its Opinion and Order, the trial court explained:

> This gives us child support of $557 according to the guidelines. Mr. Fiorenza does have two other young children,[1] which is a proper deviation from the guidelines under FL § 12–202(a)(2)(iii)(2). We believe it would be in the best interests of Justin that his half-siblings not have to do without (any more than necessary). We find $400 per month to be reasonable.
>
> [1] One has serious medical problems, but they haven't been quantified.

The departure from the Guidelines was fully explained. The addition of two half-siblings on the father's side of the family is *per se* a significant part of the departure rationale. The testimony revealed that "Justin loves [those siblings] and they love him." The younger half-brother, Louis, moreover, has serious medical problems as a result of having been born prematurely. He had a stroke at birth, has weakness on the right side of his body, and cannot use his right arm. Louis "needs physical therapy and occupational therapy" and has possible cognitive problems. On the facts of this case, this $157 per month downward departure from the Guidelines, guidelines based on the assumption of a single child, is not, we hold, an abuse of discretion.

■ The thrust of the appellant's argument that Judge Cawood abused his discretion is in the unfounded assertion that Judge Cawood considered the fact that Fiorenza had two other children to support but refused to take into consideration the comparable fact that Dunlap also had another child to support. "[T]he court made no such finding for Justin's half sister (Appellant's daughter) even though Appellant was providing her [a] proportionate share of child support." "Yet

no such analysis or deviation [for Dunlap] was allowed." The appellant claims that, in terms of their respective younger children, Judge Cawood subjected the mother and the father to unequal treatment. At first glance, we were almost persuaded that that was the case. Judge Cawood, of course, did no such thing.

The appellant's argument is based on a false premise. It assumes that the Guidelines' presumptive figure of $1,007 as total monthly support of Justin is an irreducible fixed sum and, fallaciously applying an inverse proportion with no basis for doing so, that if Fiorenza is permitted to pay $157 less, Dunlap will *ipso facto* be required to pay $157 more. That is preposterous. What the Guidelines would, in a vacuum, have presumed to be Dunlap's contribution of $450 per month toward Justin's support will not be raised, as the appellant suggests, but will inevitably be lowered. What she is able to contribute and will be expected to contribute will be a lesser amount because of the addition to her family of her younger daughter, just as Fiorenza's ability to contribute is lowered because of the addition to his family of two younger children. In Dunlap's case, the lowered expectation, of course, is not reflected in Judge Cawood's order for the simple reason that Dunlap is under no court order to pay child support. The same financial phenomenon, however, affects the ability to contribute of the father and the mother alike. Each had additional children to support.

Once Justin's siblings and half-siblings are factored into the equation, the presumptive figure of $1,007 per month in support self-evidently cannot stand undisturbed as if he were an only child. What the Guidelines establish as the presumptively correct figure in support that a child may expect from the combined income of his parents is not unaffected by the fact that the support must sometimes be shared by siblings. The Guidelines themselves take cognizance of this inexorable mathematical fact of life. Given, dollar for dollar, the combined parental income in this case of $9,334 per month, hypothesize what would happen to Justin's expectation if the child support were being ordered for two children instead of

one. However compelling his needs, § 12–204(e) of the Guidelines (the Chart) shows that Justin's presumptive support would be reduced from $1,007 per month to $783 per month (one-half of the $1,566 support payment that would be ordered for two children). If we were to posit child support for three children, Justin's expectation would be reduced to $654 per month (one-third of $1,963). Let the child support be for four and Justin would be reduced to a personal expectation of $552 per month (one-fourth of $2,206). Hypothesize support payments for five and the Guidelines would reduce Justin's personal share of presumptive support to $482 per month (one-fifth of $2,409). Let the support payments be for six children and Justin's support, notwithstanding the unchanging nature of his needs, would be reduced by the Guidelines from $1,007 per month to $429 per month (one-sixth of $2,579). It is axiomatic that with respect to any fixed dividend (the combined income of the parents), the greater the divisor (the number of children) the smaller the quotient (the support per child).

The reduction of the expected support per child is effectuated by § 12–204(e) when the addition of siblings results in additional child support orders. The reduction of the expected support per child is effectuated, more flexibly, by § 12–202(a)(2) when the addition of siblings or half-siblings is external to the child support order itself but nonetheless has an inevitable influence upon it. In either event, the law of division is inexorable.

Justin as one of four is not the same as Justin as an only child. Even in the happiest of unified families, an older child will see his or her expectation of parental largesse—his or her patrimony—diluted every time a new brother or sister is added to the family picture. For a trial judge to recognize this fact of life is not an abuse of discretion.

Underscoring our conclusion that Judge Cawood did not abuse his discretion by way of being unduly indulgent of Fiorenza is the stark fact that Fiorenza walked into the modification hearing paying $200 per month in total support

and ended up paying $700 per month. A 350 per cent increase is not an arbitrary indulgence.

## FAILURE TO BACK–DATE SUPPORT ORDER

■ At the conclusion of his Opinion and Order, Judge Cawood required Fiorenza to pay child support and contribute to Justin's schooling "beginning July 1, 1998." Dunlap contends that Judge Cawood erred in failing to back date the support order and to require Fiorenza to pay a proportion of Justin's expenses related to 1) dental work, 2) therapy, 3) medical insurance, 4) tutoring expenses, and 5) tuition payments for the 1997–98 school year. Dunlap further complains that not only did the court refuse to back-date the award, but it failed to articulate on the record its reasons for the refusal.

At the outset, the motion for an increase in child support was filed by Dunlap on September 23, 1997. Section 12–104(b) of the Family Law Article provides that "[t]he court may not retroactively modify a child support award prior to the date of the filing of the motion for modification." According to the plain language of the statute, the court could not modify support for the time period prior to September 23, 1997. With respect to the time period after September 23, 1997, "[t]he court *may* modify a child support award" "upon a showing of a material change of circumstance." Md.Code Ann., Fam. Law § 12–104(a)(emphasis supplied).

In *Tanis v. Crocker*, 110 Md.App. 559, 678 A.2d 88 (1996), we held that the trial court did not abuse its discretion when it set as the date on which to begin child support modifications the first day of the hearing rather than the date on which the petition to modify support was filed. We there explained:

> Section 12–204(b) [of the Family Law Article] makes clear that *it is within the trial court's discretion whether and how far retroactively to apply a modification of a party's child support obligation* up to the date of the filing of the petition for said modification. . . .

> *[T]he law does not require that awards be retroactive.* It provides only that: "The court may not retroactively

modify a child support award prior to the date of the filing of the motion for modification." [Appellant] possesses no right to restitution or recoupment following a modification of support; it is within the discretion of the chancellor to determine whether to make the award retroactive to the time of filing.

*Id.* at 570, 678 A.2d 88 (quoting *Krikstan v. Krikstan,* 90 Md.App. 462, 472–73, 601 A.2d 1127 (1992))(emphasis supplied). In accordance with § 12–104 and our decision in *Tanis,* we are not persuaded that Judge Cawood abused his discretion in making the child support obligations effective as of July 1, 1998.

## FAILURE TO ORDER FIORENZA TO PAY ONE–HALF OF TUITION

In determining an appropriate contribution with regard to Justin's tuition at Queen Anne's School, Judge Cawood held:

Under *Witt v. Ristaino,* 118 Md.App. 155 [701 A.2d 1227 (1997)], we can clearly award the costs of private school, and need not do so in proportion to the parties' salaries. Queen Anne's is not cheap. It costs slightly over $10,000 per year. However, it appears to be the only answer. Mr. Fiorenza is understandably concerned about paying tuition of that magnitude, especially when he has the other children as indicated, but, it would be inappropriate to require Mrs. Dunlap to pay all the expenses. We believe that $300 per month is an appropriate amount toward the private schooling.

Dunlap argues that Judge Cawood abused his discretion in not ordering Fiorenza to pay at least one-half of Justin's tuition.

In *Witt v. Ristaino,* 118 Md.App. 155, 173–78, 701 A.2d 1227 (1997), we held that a judge is not bound by any rigid mathematical formula but may exercise discretion in determining the contribution that one parent may be ordered to pay toward a child's exceptional tuition expenses. In this case, Fiorenza was ordered to pay, in addition to his increased child support payment, $300 per month or $3,600 per year toward

Justin's tuition at Queen Anne's School. That tuition, to be sure, was approximately $10,000 per year.

Several factors clearly influenced Judge Cawood's discretionary determination. Fiorenza had offered to assume primary physical custody of Justin in order to place him in a Catholic school in Pennsylvania with a far smaller tuition, but Dunlap understandably opposed that arrangement. With the $300 per month contribution toward tuition, moreover, Fiorenza had been subjected to an increase in his total monthly payments from $200 per month to $700 per month. Under the circumstances, we cannot say that Judge Cawood abused his discretion in not ordering a greater contribution than $300 per month.

At oral argument, moreover, we were informed that Justin is no longer at Queen Anne's School with its $10,000 per year tuition but in another school with a tuition of approximately $5,000 per year. It may well be that the parties will do some rethinking or seek some modification with respect to their respective contributions. All of that, however, is beyond our present vision. It is enough for us to conclude that Judge Cawood did not abuse his discretion in this regard.

## THE CROSS–APPEAL

### Award of Counsel Fees to Dunlap

■ In his Opinion and Order, Judge Cawood ruled:

There is a request for counsel fees. The salaries, as we have imputed them, are not terribly disparate, although hers is lower. She was certainly justified in seeking more support for the school. We believe that Defendant ought to contribute $1,000 for counsel fees, payable at $100 per month.

Fiorenza claims that such an award was erroneous.

Section 12–103 of the Family Law Article, entitled "Award of costs and counsel fees," provides:

(a) *In general.*—The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:

(1) applies for a decree or modification of a decree concerning the ... support ... of a child of the parties[.]

Subsection (b) lists factors that a court *shall* consider when determining if an award of counsel fees is appropriate. Those factors include "(1) the financial status of each party, (2) the needs of each party, and (3) whether there was substantial justification for bringing, maintaining, or defending the proceeding."

In determining an appropriate contribution toward another party's attorney's fees, the trial court is vested with wide discretion. In this case, Dunlap was fully justified in seeking a modification of child support. The fact that child support was increased from $200 per month to $400 per month and that a contribution of $300 per month toward tuition was ordered is evidence of her justification in seeking such modification. As Judge Cawood pointed out, moreover, the salaries of the two parties are roughly comparable but Fiorenza does make slightly more per year than does Dunlap. With the contribution that Fiorenza was ordered to pay to Dunlap being a modest $1,000 in ten monthly installments of only $100 per month, we not only can find no abuse of discretion on the part of Judge Cawood but we are not inclined to analyze in any further detail this essentially trivial contention.

## WHO GETS THE INCOME TAX EXEMPTION?

Fiorenza requested Judge Cawood to order Dunlap, as an unemployed parent, to execute a waiver entitling Fiorenza to claim Justin as a dependent for income tax purposes. Fiorenza now claims that Judge Cawood's refusal to grant him that tax exemption was an abuse of discretion.

In *Wassif v. Wassif,* 77 Md.App. 750, 759–61, 551 A.2d 935 (1989), we held that a trial court *may* order a custodial parent to execute a waiver of a dependency exemption in favor of a non-custodial parent who is paying child support. Whether to

order such a waiver is within the discretion of the trial court. *Id.; Scott v. Scott,* 103 Md.App. 500, 522, 653 A.2d 1017 (1995). We perceive no abuse of discretion.

With the determination in Fiorenza's favor, moreover, that Dunlap had voluntarily impoverished herself and would have attributed to her a potential income of $50,000 per year, the factual predicate for his argument disappears. In any event, we see no abuse of discretion.

*JUDGMENT AFFIRMED; 2/3rds OF THE COSTS TO BE PAID BY APPELLANT/CROSS-APPELLEE AND 1/3rd TO BE PAID BY APPELLEE/CROSS-APPELLANT.*

Concurring and dissenting Opinion by HOLLANDER, J.

HOLLANDER, Judge, concurring and dissenting:

I concur in part and dissent in part. Although I agree with the majority as to the voluntary impoverishment issue and the disposition of the issues raised in the cross appeal, I believe the trial court erred or abused its discretion 1) when, on the record before it, the court deviated downward from the child support guidelines because the father now has two young children from a recent marriage; 2) by failing to make the support order retroactive to the date of the mother's petition for modification; 3) by failing to require the father to contribute to the child's medical and educational expenses, which were incurred by the mother during the pendency of her petition for modification; and 4) in regard to the amount of money assessed upon the father as a contribution towards Justin's private school tuition.

## I. Child Support

To be sure, I have no quarrel with the general proposition espoused by the majority that "a single child will enjoy the undiluted largess of both of his parents" but "the expectation of the first child is inevitably diminished" when "siblings enter the picture." I strongly disagree, however, with any suggestion in the majority opinion that the addition of half-siblings "is *per se* a significant part of the departure rationale."

Clearly, the addition of half-siblings *may*, in the appropriate case, justify a downward departure from the child support guidelines. F.L. § 12–202(a)(2)(iii)(2). But, it is not an automatic entitlement. The presumptive correctness of the child support guidelines is mandated by statute. *See* F.L. § 12–202(a)(2)(i). Mere proof that Mr. Fiorenza has two other young children, standing alone, is insufficient to rebut the presumption, and therefore does not warrant a downward departure from the guidelines under F.L. § 12–202(a)(2)(iii)(2). Yet that is how the lower court analyzed the matter, and the majority has sanctioned that approach.

Moreover, F.L. § 12–202(a)(2)(iv)(2)(C) expressly requires the court to make a finding as to how the determination to deviate downward from the guidelines "serves the best interests of the child." *See Tannehill v. Tannehill,* 88 Md.App. 4, 15, 591 A.2d 888 (1991) (stating that when the trial court determines that a departure from the guidelines is warranted, the court must make a finding, *inter alia,* as to how the departure serves the best interests of the children). The lower court's statement that "it would be in the best interest of Justin that his half-siblings not have to do without (anymore than necessary)" is, in my view, an inadequate explanation as to how the downward departure from the guidelines serves Justin's best interests.

Additionally, a review of the record does not provide an adequate evidentiary basis for the trial court's decision. Although Louis, the father's youngest child, has health problems due to Louis's premature birth, the lower court acknowledged that Louis's medical problems were not "quantified." Indeed, no evidence was presented as to any out-of-pocket expenses actually incurred by appellee for the care and treatment of Louis. When Mr. Fiorenza was questioned about the health problems of his baby, he conceded that he has health insurance coverage. The following colloquy is relevant from re-cross examination:

APPELLEE'S COUNSEL: And the medical [expense], $494 a month. Does that include your wife and your new children?

MR. FIORENZA: Sure.

APPELLEE'S COUNSEL: And that's for what exactly?

MR. FIORENZA: That is for medical, dental and vision insurance.

Mrs. Fiorenza also testified at the hearing. In answer to a question about the special needs of Louis, she said: "So far, a lot of it is unknown." When asked about the health care expenses for the baby, Mrs. Fiorenza said: "At this point, they are unknown. We have the physical therapy and occupational therapy that's going to happen every week. I mean, down the road, if he has any learning disabilities or anything like that—." She was again asked about the cost of the baby's medical care and answered: "At this point, we don't [know]. I know that insurance does not cover all of it."

It is equally significant that the court never considered whether Mrs. Fiorenza contributes to the family's income. The majority has ignored that evidentiary gap, even though it upholds the court's attribution of $50,000 in income to Justin's mother, who elected to quit her job in order to attend to Justin, who clearly had emotional difficulties. Moreover, she, too, has a younger child. The trial judge acknowledged that appellant's decision to quit work appeared to help Justin, and the judge had "some sympathy for [the mother's] position." Nevertheless, the court said: "Unfortunately, were we to apply the litmus test, every mother (and some fathers) could stop working because it would be better to raise the children (especially at a younger age). *Our world does not permit this. Two income families are the norm, and single parents cannot stay home and take care of the children.* We must posit $50,000 to her." (Emphasis added).

What is good for the goose is good for the gander. Although I agree with the trial court's determination to attribute $50,000 in income to appellant, and I would not quarrel with Mrs. Fiorenza's decision to forego a job outside the home in order to maximize her time with her children, I am nonetheless dismayed that the court deviated from the guidelines without considering Mrs. Fiorenza's financial circumstances.

If the court felt obliged to attribute income to Ms. Dunlap, even though she no longer works outside the home, the court, at a minimum, ought to have considered whether the mother of Mr. Fiorenza's two other children contributes to their economic well being.

Evidentiary snippets indicate that Mrs. Fiorenza is an educated woman, and she does, indeed, have a job. Mrs. Fiorenza testified that she is "college educated, I'm a registered nurse." Moreover, the evidence revealed that she is employed on a part-time basis. At the hearing, Mr. Fiorenza testified that when his wife worked, she earned $25,000 a year. At the time of the hearing, he said: "She's working part-time, so it's considerably less." Yet, Mr. Fiorenza acknowledged monthly contributions to a mutual fund of $150, made "from my wife's pay." Further, he said: "My wife is the one that supplies that fund."

The court's decision to deviate from the guidelines is all the more curious in view of the parties' earnings disparity. The court attributed $50,000 in income to the mother, which she of course does not really earn. On the other hand, the court attributed $62,000 in income to the father, a sum that corresponded to his net taxable business income in 1997. But, appellee's tax return shows gross business income for 1997 in excess of $88,500. From that sum, appellee deducted over $6,000 in car expenses and claimed an expense of about $9,000 for meals and entertainment. Justin's needs did not have to be sacrificed in order to maintain the father's lifestyle.

I also disagree with the majority's assertion that the "guidelines themselves take cognizance of [the] unavoidable mathematical fact of life" that the presumptive support figure for one child "cannot stand undisturbed" when siblings are involved. The majority overlooks that the guidelines refer to multiple children in the same household, and obviously take into account certain economies of scale inherent in having more than one child in the home. When a family has one child, the family needs a place to live, including a bedroom for the child. In a family with three children, however, the family

might well make do in the same living space, by having the children share the bedroom and bathroom. Other costs, such as utilities, are also largely fixed, regardless of whether there is one child or more than one in the home. Moreover, in the examples posited by the majority, although Justin's share of the overall child support declines as the number of children in the home increases, the total child support available to the custodial parent increases with every additional child.

In sum, the father had the burden to rebut the presumption that the guidelines amount of support was correct. Merely having two other children is not enough to rebut the presumption. I agree with appellant that "if a downward deviation was appropriate in every case where there are subsequent children born to a party, the legislature would have provided for same in the same manner that the guidelines allow a parent to deduct pre-existing child support." Moreover, the suggestion of the majority that the court did not abuse its discretion because the father suffered an overall increase in his child support obligation is surely not the test of whether the court abused its discretion.

## II. Retroactivity

### and

### III. Post Petition Expenses

In my view, the trial court abused its discretion in failing to make the child support order retroactive to the date of the mother's filing of her petition in September 1997. *See* F.L. § 12–104(b). At that time, the mother sought an increase in child support and contribution for medical and tuition expenses incurred during the 1997–1998 school year. I also believe the trial court erred when it failed to award any reimbursement to the mother for medical expenses, and abused its discretion by failing to assess the father for the additional tuition costs incurred while the petition was pending.

The evidence showed that, as of September 30, 1997, there was a remaining balance of $980 for Justin's orthodontic

expenses. In addition, the evidence showed that, subsequent to filing her petition, appellant paid Dr. Robert Marcus $950 for mental health counseling for Justin. Prior to filing the petition, the mother had consulted with Dr. Harold Levinson in New York in connection with Justin's attention deficit hyperactivity disorder, and that doctor scheduled a re-evaluation of Justin for a month following the hearing. The mother estimated that medical visit would cost over $800, and it would not be covered by insurance. In addition, the mother paid Justin's monthly health insurance premium. She also incurred tutoring expenses of over $1,000 for Justin during the Fall 1997 semester. During the 1997–1998 school year, Justin was enrolled at Queen Anne's School, and tuition payments for that year amounted to $9,300, which the mother also paid. At the time of the hearing, appellee was paying just $200 in monthly child support and $200 a month toward Justin's tuition. Notwithstanding the size of Justin's medical and tuition bills during the relevant period, and their necessity, the court did not require appellee to contribute a single cent.

F.L. § 12–204(h) provides:

> *Extraordinary medical expenses.*—Any extraordinary medical expenses incurred on behalf of a child shall be added to the basic child support obligation and *shall* be divided between the parents in proportion to their adjusted actual incomes.

(Emphasis added). Further, F.L. § 12–201(h)(1) defines "extraordinary medical expenses" as "uninsured expenses over $100 for a single illness or condition." F.L. § 12–201(h)(2) expressly includes "uninsured, reasonable, and necessary costs for orthodontia, . . . and professional counseling or psychiatric therapy for diagnosed mental disorders" as extraordinary medical expenses.

In *Boswell v. Boswell,* 118 Md.App. 1, 34–35, 701 A.2d 1153 (1997), *aff'd.,* 352 Md. 204, 721 A.2d 662 (1998), we reversed the circuit court because it ordered the father to shoulder the cost of all unreimbursed medical expenses for the children. Writing for the Court, Judge Davis said that "the circuit court

erred by ordering [the father] to pay all unreimbursed medical expenses for the children rather than split the cost of those expenses according to income." *Id.* at 34, 701 A.2d 1153. Here, the court departed downward from the guidelines to reduce the father's monthly child support obligation, and then did not require the father to pay any amount towards legitimate and undisputed medical expenses incurred while the petition for modification was pending.

Moreover, I believe the court abused its discretion by failing to assess the father for any portion of the hefty tuition that was incurred on Justin's behalf in the 1997–1998 school year. Clearly, the mother made a desperate attempt to find a suitable school placement for a troubled child. The court agreed with that decision, saying "it appears to be the only answer." In the face of that finding, I believe the court should have exacted a contribution from appellee towards the expense.

In sum, at the time of the hearing, although appellant was unemployed, she was paying all of Justin's medical and orthodontic bills and all but $2,400 of his tuition costs. Appellee, on the other hand, was paying $200 per month in child support and $2,400 per year towards Justin's tuition. On this record, I believe the trial court erred by failing to make child support retroactive to the date of filing of appellant's petition, and by failing to order the father to pay any of the health care expenses incurred after the petition was filed. Under the facts attendant here, the court also abused its discretion in not requiring the father to contribute to the tuition expense for the 1997–1998 school year. As appellant aptly points out: "The irony is that [the father] spent over $11,000 in attorney's fees in this case seeking custody of Justin and more involvement in Justin's life but refused ... to ... share equally in Justin's financial obligations." In its ruling, the majority has condoned that conduct.

## IV. Private School Tuition

I am further of the view that the court abused its discretion in the way in which it allocated the cost of prospective private

school tuition. As noted, the court acknowledged that Queen Anne's School "appears to be the only answer" for Justin. Yet, after failing to require the father to make retroactive child support payments, and after excusing the father from contributing to substantial medical and tuition expenses incurred by the mother for Justin after her petition was filed, and after departing downward from the statutory child support obligation, the court assessed the father only $300 per month, or $3,600 per year, towards a tuition expense of approximately $10,000 per year.

The majority seems to believe that the $300 per month contribution from the father towards tuition was appropriate, because Mr. Fiorenza was subjected to an increase in his monthly child support payment, from $200 to $400, and, coupled with the $300 monthly tuition payment, he is now shouldering a monthly obligation of $700 for Justin. Unfortunately, as the majority notes, Justin is no longer at Queen Anne's School. The reason is obvious. Justin has been forced to leave the only school where he has enjoyed success, because his mother was unable to continue to pay most of the tuition expense, along with all the other expenses the court required her to assume.

The result in this case is unconscionable, and I therefore dissent.