797 A.2d 94

**Michael Lee DURKEE**

**v.**

**Katherine Marie DURKEE.**

**No. 158, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

May 1, 2002.

162

Jeffrey P. Nesson, Owings Mills, for Appellant.

Martha Ann Sitterding, Westminster, for Appellee.

Argued before DAVIS, HOLLANDER, and RAYMOND G. THIEME, Jr., (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

In this case, we focus primarily on the propriety of a circuit court judgment granting a reservation as to an award of alimony. The case arises from the dissolution of the marriage of Michael Lee Durkee, appellant, and Katherine Marie Durkee, appellee. After more than eighteen years of wedlock, the

Circuit Court for Carroll County entered a judgment of absolute divorce on January 25, 2001, awarding legal and physical custody of the couple's two minor children to Ms. Durkee. Additionally, after imputing annual income of $62,000 to Mr. Durkee, the court ordered him to pay monthly child support of $497.55 per child. Although the court did not make a monetary award, it ordered the parties to divide equally the proceeds of sale of the marital home. Finally, the court denied alimony to appellant, but reserved as to alimony for appellee.

On appeal, appellant presents two issues for our review, which we have rephrased:

I. Did the circuit court err or abuse its discretion in reserving as to alimony for the wife?

II. Did the circuit court err in imputing income to appellant in order to calculate child support, when appellant's reduced income occurred during the marriage and the court did not find voluntary impoverishment?

For the reasons stated below, we answer question one in the affirmative. Therefore, we shall vacate the reservation and remand for further proceedings.

### FACTUAL SUMMARY

The parties were married on September 25, 1982. Two children were born to the couple: Alexander Joseph Durkee, on May 6, 1985, and Nicholas Allen Durkee, on September 23, 1987. After several temporary separations that began in 1997, the parties separated for good in November 1998.

By the time the parties married, appellant had already graduated from college. A few years after the marriage, in 1985, appellant obtained a Master's Degree in Computer Science from Johns Hopkins University. His tuition was paid with marital funds. Appellant concedes in his brief that he was the "primary financial provider" during the marriage; for most of the marriage, appellee was economically dependent upon appellant. Until about 1997, appellant worked in the field of computer technology, first as an engineer and later in

sales. He earned $78,596 in 1995, $92,417 in 1996, and $109,781 in 1997.

At the outset of the marriage, appellee worked as a dental assistant, but when the couple's first child was born in 1985, appellee ceased outside employment and became a "stay-at-home" mom. She did not resume work outside the home until the parties separated for the first time in 1997.

During the marriage, appellant's last employment was with a company called Storage Technologies. In late 1997 or early 1998, however, appellant lost that job due to a reduction in the work force. While there, appellant received a $25,000 signing bonus and a $20,000 commission check for sales made at his prior employment, Essential Communications. The parties dispute the extent to which appellant attempted to earn any money after he lost his job with Storage Technologies. But, it is undisputed that appellant elected not to seek further employment with a third party. Instead, he decided to establish his own business.

According to appellee, appellant has earned little in the way of income since 1998. Further, she testified that she was at home in 1998 during the period when appellant was supposedly trying to establish his own business, and claimed that appellant did not devote adequate effort to the endeavor. Instead, she asserted that appellant "slept late. He was back at his desk, feet up, watching Sally Jessie Raphael on TV. On the phone, he—then it would be lunchtime and he would take his flight bag on one shoulder and ski bag on the other and leave."

During this period, appellant cashed out his 401K account, which had a balance of $45,417. He also transferred the parties' joint checking account balance of about $20,000 into his own account. From these funds, appellee received just $4,500. Although appellant used some of the money to pay the family's bills, he also used some of it to pay for his personal hobbies, such as horseback riding and skiing, as well as a new Jeep Cherokee and a trip to San Francisco.

As we noted, the parties separated for the first time in 1997, when appellant left the marital home for three months. Although appellant paid the bills during the separation, appellee obtained part-time employment at a deli and used the money to pay for groceries. In March 1998, the parties experienced another separation, which lasted until July 1998. Then, in November 1998, appellee left the marital home with the children and took up residence with her sister. No further reconciliations occurred.

Appellee testified that, since November 1998, she has supported herself and the children by working full time at a greenhouse between January and May, and by making crafts the rest of the year. She earned $13,159.20 in 2000. Appellee explained that she also "made ends meet" with child support and the assistance of her parents, but had to defer certain expenses for the children, such as dental care.

Ms. Durkee's frugal lifestyle stands in sharp contrast to the one the parties enjoyed during the marriage. Appellee testified that the parties previously "went on vacations and . . . ate at nice restaurants and . . . did okay when [appellant] was earning money." She added, "we enjoyed it, yeah we did." Now, however, appellee said she lives "simply." As to her current financial state, appellee stated: "Well, I'm hoping to make ends meet with what I do and my business."

Appellant explained his conduct after losing his job by saying that he was not ready to "search [for] employment," because he did not know what he wanted to do. Moreover, appellant said he did not seek unemployment benefits after he lost his job, because he "wanted to build [his] own business." Consequently, he decided to keep his "options open" and "was keeping an ear to the ground." The following testimony is noteworthy:

[APPELLEE'S COUNSEL] Okay. And, in 1998, do you believe that there were job openings in the Baltimore/Washington area for a person holding a Master's Degree in Computer Science?

[APPELLANT] Yes.

[APPELLEE'S COUNSEL] And, that didn't change in 1999 or 2000, did it?

[APPELLANT] There's always job openings.

\* \* \*

[APPELLEE'S COUNSEL] And, in 1998, do you believe that there were job openings in the Baltimore/Washington area for a person with systems engineering experience?

[APPELLANT] Yes. Uh—huh.

[APPELLEE'S COUNSEL] And, that didn't change in 1999 or 2000, either, did it?

[APPELLANT] No.

[APPELLEE'S COUNSEL] From 1998 to the present, how have you been employed?

[APPELLANT] I have been self-employed.

[APPELLEE'S COUNSEL] And, what is the name of the business?

[APPELLANT] Durkee Strategic Technologies.

\* \* \*

[APPELLEE'S COUNSEL] And, in 1998, what earnings did you derive from that business?

[APPELLANT] A couple thousand.

[APPELLEE'S COUNSEL] In 1999, what earnings did you derive from that business?

\* \* \*

[APPELLANT] ... I think I had a loss of like Twelve Thousand.

[APPELLEE'S COUNSEL] And, in the year 2000, what income did you derive from that business?

[APPELLANT] I had revenues of Eighty Thousand and my income is probably gonna [sic] be about Fifteen to Twenty, somewhere along—that range.

[APPELLEE'S COUNSEL] And, you did not seek outside employment in 1998, 1999, and 2000, did you? Did not seek third party employment?

[APPELLANT] There might have been an early part in '98 where I did.

[APPELLEE'S COUNSEL] Okay. Were you successful?

[APPELLANT] Not really, no.

[APPELLEE'S COUNSEL] Okay. Did you have any job offers?

[APPELLANT] I think I—well, I did actually have—I mean, my whole purpose was to go and—was to start my own business. At the same time, I was having trouble getting it started and so, certainly, I was keeping my options open and I was keeping an ear to the ground.

\* \* \*

[APPELLEE'S COUNSEL] Did you make regular applications to third parties to be employed in early 1998?

[APPELLANT] I don't remember. It's been, what, three years?

In her original divorce complaint filed on November 12, 1998, appellee asked the court for permanent alimony as well as alimony *pendente lite.* In her Supplemental Complaint for Absolute Divorce, filed on January 14, 2000, appellee alleged "insufficient means with which to support herself . . .," and renewed her request for permanent alimony. Nevertheless, at the outset of the merits hearing on January 25, 2001, appellee asked the court, instead, to reserve as to alimony. Her attorney said:

We're . . . asking the Court to reserve alimony. We think Mr. Durkee, in the future, will want to make more money. We believe he's capable of making more money and we believe that this nearly twenty-year marriage deserves that consideration as it relates to Mrs. Durkee.

With respect to imputed income for purposes of child support and the reservation of alimony, the court stated:

Now, with regard to the imputation or imputing of salary, a question that has been raised and considerable testimony and exhibits submitted, I've taken Mr. Durkee's three highest years, Seventy-eight Thousand, a Hundred and Nine

Thousand, Seven Hundred and Ninety-two Thousand, Four Hundred to round those off. Got a total of those three years of Two Hundred Eighty Thousand, Ninety-nine Dollars, divided that by three and came up with an average of Ninety-three Thousand, Three Hundred and Sixty-six Dollars as his ... average of his highest earning over three years.

*I believe that, based on the testimony that Mr. Durkee has not achieved his full potential as a result of his advanced degree*—Master's Degree, Science—... *computer science is one of the hottest ticket status [sic] that a person can have in our present economy* and environment—and whether he is successful based on his own abilities to run his own business as an entrepreneur or working for wages for someone else using his highest skills, *he has infinite potential to earn.*

So, I've taken this Ninety-three, Three Sixty-six ... but in this case, *I believe that a fair imputation of salary based on your infinite ability to earn and your decision to be self-employed is Sixty-two Thousand Dollars* and I'm imputing Sixty-two Thousand Dollars for purposes of child support. Now, on the question of reservation of alimony and relying on the case that you cited, Turrisi versus Sanzaro, 308 Md. 515[, 520 A.2d 1080], *I find that, in the reasonably foreseeable future, the Plaintiff will be in circumstances that would justify an award of either rehabilitative or indefinite alimony.* She may wish to retrain or the Court could find, based on testimony to be considered at that time, that the situation of ... these parties' marriage of long duration is so unconscionably disparate, that an award of indefinite alimony could be granted sometime in the future. I don't have to make those findings today because *I'm simply reserving on alimony and not deciding on a particular sum of ... alimony.*

When people marry, of course, the law provides certain standards to get married; the church provides certain standards; we have all heard the terms of marriage "for better or for worse, for richer or for poorer, in sickness and in

health." You earned, Mr. Durkee, a Master's Degree ... in Computer Science at Johns Hopkins University with tuition paid by you and your wife. The family unit had a right to believe that your degree and your abilities would benefit the entire family. Now, you chose ... to become self-employed. That's great, because I think you have the skills to be a successful entrepreneur; you can use some of that—what did you call it—red hot or real slick software and make yourself a lot of money. I believe you have the ability to do that, but part of the basis upon which you will achieve that success as an entrepreneur or as a person working for wages is as a result of the sacrifices [of the wife], both financially and in the house ... *[I]t just would not be fair to the parties to have you in the posture that you are today and thirty days after a divorce was granted that did not reserve on alimony, you go out and earn your potential. That would constitute in ... an injustice.* So, what I'm doing today is simply reserving on that question.

(Emphasis added)

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant contends that the court erred in reserving as to alimony. He maintains that appellee "is only entitled to rehabilitative or permanent alimony, if it is requested." Because appellee failed to make a request for immediate alimony, appellant claims that Ms. Durkee has no right to alimony at "some indefinite time after that hearing." Moreover, Mr. Durkee characterizes "as a trial tactic" appellee's request for a reservation of alimony, arguing that "the testimony clearly showed that Michael was the 'breadwinner,' that Michael had had substantial income years between 95–97, and that [appellee] had been a house wife [sic] during most of the marriage." He asserts:

Boiled down to the bare facts, [appellee] has requested the opportunity to request alimony in case her ex-husband

earns more money. She does not testify that she has any substantial needs that are unmet. She does not testify that her health will deteriorate for reasons known at the time or that she desires the opportunity to be retrained.

\* \* \*

Essentially, Mrs. Durkee is requesting the opportunity to request alimony in case she needs assistance.

With respect to alimony, appellee counters, in part:

Although the parties' earnings at the time of the divorce were not unconscionably disparate, it is solely the choice of the husband that has made it so. As such, equity demands that the Court reserve alimony such that if the Husband returns to employment with a third party and earns funds equivalent to his prior earnings, the Wife should receive a benefit from that employment.

When reviewing a trial court's award as to alimony, an appellate court will not reverse the judgment unless it concludes that "the trial court abused its discretion or rendered a judgment that was clearly wrong." *Crabill v. Crabill,* 119 Md.App. 249, 260, 704 A.2d 532 (1998); *see Tracey v. Tracey,* 328 Md. 380, 388, 614 A.2d 590 (1992). Moreover, "appellate courts will accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings." *Tracey,* 328 Md. at 385, 614 A.2d 590.

The statutory provisions governing the award of alimony are contained in Title 11 of the Family Law Article. They enable the trial court to ensure " 'an appropriate degree of spousal support . . . after the dissolution of a marriage.' " *Innerbichler v. Innerbichler,* 132 Md.App. 207, 246, 752 A.2d 291 (quoting *Tracey,* 328 Md. at 388, 614 A.2d 590), *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000). Nevertheless, the Court of Appeals made clear in *Tracey* that the "purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart

and independently." *Tracey*, 328 Md. at 391, 614 A.2d 590. The Court of Appeals explained:

[A]limony's purpose is to provide an opportunity for the recipient spouse to become self-supporting. The concept of alimony as life-long support enabling the dependent spouse to maintain an accustomed standard of living has largely been superseded by the view that the dependent spouse should be required to become self-supporting, even though that might result in a reduced standard of living.

*Id.* (citations and quotations omitted).

Thus, "Maryland's statutory scheme favors fixed-term, rehabilitative alimony rather than indefinite alimony." *Innerbichler*, 132 Md.App. at 244, 752 A.2d 291. Rehabilitative alimony is consistent with "the 'policy of this State . . . to limit alimony, where appropriate, to a definite term in order to provide each party with an incentive to become fully self-supporting.'" *Digges v. Digges*, 126 Md.App. 361, 386, 730 A.2d 202 (quoting *Jensen v. Jensen*, 103 Md.App. 678, 692, 654 A.2d 914 (1995)), *cert. denied*, 356 Md. 17, 736 A.2d 1065 (1999); *see Rock v. Rock*, 86 Md.App. 598, 608, 587 A.2d 1133 (1991); *Blake v. Blake*, 81 Md.App. 712, 727, 569 A.2d 724 (1990); *Rogers v. Rogers*, 80 Md.App. 575, 591, 565 A.2d 361 (1989).

Notwithstanding Maryland's preference for rehabilitative alimony, in appropriate cases F.L. § 11–106 continues to permit a court to award indefinite alimony. Nor does the statute prohibit the reservation of alimony. The issue here is whether the reservation as to alimony was properly granted.

In *Turrisi v. Sanzaro*, 308 Md. 515, 520 A.2d 1080 (1987), the Court of Appeals considered whether the Alimony Act of 1980 (the "Act") abrogated the chancellor's power to reserve judgment as to an award of alimony. In that case, the parties were both medical doctors, and each was self-supporting. The wife had been diagnosed with multiple sclerosis, however, and was forced to abandon surgery and hospital work in favor of part-time work in a medical office. The evidence also showed that multiple sclerosis is a chronic, progressive disease that

would probably render the wife totally disabled in less than five years. While the wife was self-supporting at the time of the hearing, she sought the right to seek alimony in the future, in the event that she became unable to support herself due to her poor health. Nevertheless, the chancellor determined that the wife had declined an immediate award of alimony, and that he did not have the power to reserve with respect to future alimony.

The Court of Appeals disagreed and reversed. The Court held that the Act did not "abolish[ ] the inherent power of an equity court to reserve jurisdiction as to alimony when it awards a divorce." *Id.* at 528, 520 A.2d 1080. Rather, the Court concluded that the chancellor retains discretion under the Act to reserve as to alimony. *Id.* The Court explained:

The concepts of rehabilitative alimony for a definite time, the desirability of each spouse becoming self-supporting, the undesirability of alimony as a lifetime pension, and the use of indefinite alimony only in exceptional circumstances do not mandate the elimination of the power to reserve.

For example, facts before a court may demonstrate no present basis for either rehabilitative or indefinite alimony. But those same facts may show that a highly probable basis for awarding one or the other will exist in the immediate future. Under such circumstances, we see no reason why reservation would be inconsistent with the purposes of the Act. Indeed, under such circumstances, reservation would be consistent with the Act's overall purpose ... to provide for an appropriate degree of spousal support in the form of alimony after the dissolution of the marriage.

*Turrisi,* 308 Md. at 527, 520 A.2d 1080.

In reaching its decision, the Court reviewed the historical treatment of alimony by Maryland equity courts, noting the "long-standing rule" that "the right to claim alimony ordinarily could not survive the dissolution of the marriage." *Id.* at 521, 520 A.2d 1080. *See also Thomas v. Thomas,* 294 Md. 605, 609–615, 451 A.2d 1215 (1982) (discussing historical treatment of alimony in Maryland). Consequently, the Court observed that

it became "common practice for the equity courts to reserve jurisdiction over alimony, even though none was awarded at the time of divorce." *Turrisi*, 308 Md. at 522, 520 A.2d 1080. The reservation enabled the court to award alimony "long after the grant of an absolute divorce." *Id.*

The Court recognized that the Act, now codified in Title 11 of the Family Law Article, had a profound effect on "the alimony landscape." *Id.* at 525, 520 A.2d 1080. Yet, as the Court observed, the Act was silent as to reservation. *Id.* at 527, 520 A.2d 1080. Concluding that the many changes generated by the Act did not alter the equity court's inherent power to reserve, *id.* at 525–26, 520 A.2d 1080, the Court reasoned: "To ask us to assume that by mere silence the legislature intended to abolish a long-standing inherent power of Maryland equity courts, specifically called to its attention by the [Governor's 1980] Commission [on Domestic Relations Law], is to ask too much." *Id.* at 527, 520 A.2d 1080. Noting that the "[r]epeal of such a power by silence is not favored," the Court declined to "indulge any such assumption. . . ." *Id.* at 527, 520 A.2d 1080. Nor did it believe that the purpose of the Act mandated the abolishment of the power to reserve. *Id.*

Notwithstanding the continued power of an equity court to reserve, the Court made clear that a reservation requires the proper exercise of discretion. Moreover, the Court specified a number of circumstances in which a reservation "is no longer proper." *Id.* at 529, 520 A.2d 1080. For example, the Court declared that a reservation would not be appropriate based on a "vague future expectation. . . ." *Id.* Elaborating on the types of circumstances that would or would not justify a reservation, the Court said:

> To hold that the power to reserve [alimony] still exists is not to say that it may be appropriately exercised in every case. The power is a discretionary one, and whether a chancellor should exercise his discretion in favor of reservation is a matter affected by various considerations, non-statutory as well as statutory. . . . Furthermore, in view of the Act's emphasis on promotion of economic self-sufficiency, its favorable approach to alimony for a definite period, and its

opposition to the notion of alimony as a lifetime pension, *it would not be appropriate to reserve simply because there may be some vague future expectation of circumstances that might show a basis for alimony.  By the same token, the possibility that a claimant might become aged, infirm, or disabled, or that standards of living could conceivably be unconscionably disparate at some unknown future date, thus potentially invoking § 11–106(c), would not provide a basis for reservation.*  Reservation like that approved in *Buehler [v. Buehler],* 229 Md. [317] at 319, 182 A.2d [877] at 878, where a wife obtained reservation merely on an allegation that her future ability to support herself was " 'of necessity uncertain,' " is no longer proper.

\* \* \*

On the other hand, there may be cases which do not involve monetary awards, family homes, or reasonable and necessary expenses, and in which grounds for divorce unquestionably exist.  The case before us is one.  If, in a case of this sort, the record contains evidence from which the chancellor could find that the claimant, in the reasonably foreseeable future, will be in circumstances that would justify an award of rehabilitative or indefinite alimony, it would not be an abuse of discretion to reserve.

*Turrisi,* 308 Md. at 528–530, 520 A.2d 1080 (internal citations omitted) (emphasis added).

Thus, *Turrisi* announced that the power to reserve with respect to an award of alimony remains a viable option in the discretion of the chancellor, but the particular circumstances must warrant the reservation.  *Turrisi* illustrates the principle that, "even with respect to a discretionary matter, a trial court must exercise its discretion in accordance with correct legal standards."  *Alston v. Alston,* 331 Md. 496, 504, 629 A.2d 70 (1993); *see Gallagher v. Gallagher,* 118 Md.App. 567, 576, 703 A.2d 850 (1997), *cert. denied,* 349 Md. 495, 709 A.2d 139 (1998).  In the *Turrisi* Court's view, the *probable* deterioration of a spouse's health, already known at the time of the divorce, justified the exercise of discretion in favor of a

reservation. On the other hand, the Court expressly indicated that the future *possibility* of disparate standards of living would not constitute a proper basis on which to reserve. *See also* John F. Fader and Richard F. Gilbert, MARYLAND FAMILY LAW § 4–10(b) (2nd ed. 1990).

In this case, the evidence showed, and trial court clearly believed, that appellant had the capacity to earn a substantial living, but had instead elected to pursue the establishment of his own business, with adverse financial consequences to the family. The parties' 1998 joint tax return showed that appellant's business, Strategic Technologies, Inc., sustained a loss of $2619.00. The evidence also included a profit and loss statement for the company for 2000, showing that the company generated a profit of $10,369.60. The statement does not reflect a salary paid by the company to appellant.

Apart from what we just mentioned, neither side presented evidence tending to establish the likelihood of future success of appellant's business venture. Nor was there any evidence by which to gauge whether the current circumstances of the business are likely to change in the foreseeable future. Although the court did not expressly find that appellant had deliberately attempted to impoverish himself so as to dodge the payment of alimony, the evidence demonstrated that appellant's efforts regarding his business venture were hardly serious.

Based on appellee's request for reservation and appellant's circumstances, the court decided not to burden appellant with an immediate alimony obligation. At the same time, the court surely would have known that if it did not make an immediate award of alimony, it would not be able to award alimony in the future unless it reserved. It appears to us that the court sought to avoid a situation in which appellant's current economic plight enables him to avoid altogether his obligation to provide spousal support. Put another way, the court evidently recognized that, due to appellant's impecunious circumstances, he was not then in a position to pay meaningful marital support. Yet, appellant could literally walk out of the court-

house and immediately opt for employment in the private sector, which would permit him to earn substantial wages, commensurate with his past earnings and capabilities. Were that to happen, appellant would succeed in depriving appellee of support because, absent an immediate alimony award or, alternatively, a reservation as to alimony, the court would have no power to order appellant to pay alimony, regardless of his earnings. In an apparent effort to protect against that situation, the court reserved.

.Appellee's decision to request a reservation was undoubtedly fueled by similar practical considerations. She and the children endured a major economic setback and a significant change in lifestyle when appellant separated from his last job and began to toy with his own business. Nevertheless, because appellant had virtually no current means to pay alimony, albeit by his own doing, appellee sought, instead, to obtain alimony if and when appellant was in a position to pay it, either as a result of the future success of his start-up business or his return to employment by a third party.

Certainly, many people in appellee's circumstance would have sought and obtained an award of immediate alimony, without regard to how difficult it might be to collect. In requesting a reservation of alimony, rather than an immediate alimony award, it seems to us that appellee recognized the adage that one cannot get water from a stone, nor was she interested in the proverbial paper judgment. Put another way, given that appellant's meager earnings at the time of divorce were insufficient to enable appellee to collect alimony, regardless of an award of alimony, appellee saw little sense in asking for it. Conversely, because appellant had the ability to earn as much as $100,000 annually, through employment with a third party, appellee did not want to relinquish her claim to alimony, if and when appellant ever began to earn a living commensurate with his past earnings and his current ability.

In light of the circumstances of this case, we construe *Turrisi* to suggest that the circuit court was not entitled to reserve as to alimony based on a wait-and-see approach.

Given the evidence presented, we conclude that the question of when, if at all, appellant's business would prove economically successful fell within the category of "vague future expectation of circumstances," which *Turrisi* rejected as a ground for reservation. At the very least, even if a payee spouse is amenable to a reservation, a court ought not to reserve as to alimony on the basis of a new business enterprise undertaken by the obligor spouse, unless the evidence affirmatively shows that the obligor spouse has made a serious commitment to the success of the venture, by way of financial resources, effort, or both, and that the economic success of the business is probable, not merely possible, within a reasonable time. Clearly, such evidence was altogether lacking here.

We acknowledge that there are many instances when an individual reasonably and commendably decides to take a risk in regard to launching a business endeavor or pursuing an alternative career. In pursuit of such an effort, there may be a period of time when the individual takes two steps back economically in the hope of an eventual leap ahead. Moreover, if the payee spouse is willing and able to delay the receipt of alimony by making temporary adjustments in lifestyle, such as living with extended family pending the receipt of support, then a reservation would seem sensible, assuming it does not cause hardship to the children. In our view, however, it is the province of the General Assembly or the Court of Appeals to authorize a trial court to permit a reservation under such circumstances.

■ Although we cannot sustain the reservation in this case, we believe a remand is appropriate with respect to the matter of alimony. It is true that appellee got what she asked for by way of a reservation. But, if the court had not agreed to reserve, we are confident that appellee would have pursued, alternatively, her original request for immediate alimony. In our view, a court of equity ought now to afford appellee that opportunity. Even appellant recognizes that Ms. Durkee's initial alimony request was hardly specious, and she legitimately could have pursued it. Indeed, as appellant concedes,

he always provided the economic support for the family. Accordingly, we shall vacate the reservation of alimony and remand for further proceedings.

On remand, the court may consider appellant's potential income and his earning capacity in resolving the alimony issue. In *Digges v. Digges*, 126 Md.App. 361, 370, 730 A.2d 202, *cert. denied*, 356 Md. 17, 736 A.2d 1065 (1999), we rejected the claim that an award of alimony could not be calculated based on a spouse's potential income. To the contrary, we recognized that potential income is relevant to a consideration under F.L. § 11–106(b)(9), which concerns the ability of the party from whom alimony is sought to meet that party's needs, while also meeting the needs of the party requesting alimony. *Id.* On the other hand, mindful of its original ruling, the court might also consider a relatively small award of immediate alimony, which would be subject to modification in the event of a change in circumstances.

## II.

Appellant complains that the court erred in imputing income to him for purposes of calculating child support, because it "did not make a specific finding of voluntary impoverishment," so as to justify the award of child support. Appellant also argues that the court erred because it failed to find that his decline in income was deliberate, and the reduction in income occurred during the marriage. Further, appellant maintains that his decline in income was not voluntary, and therefore it was improper for the court to attribute potential income to him. In this regard, Mr. Durkee maintains that "it is an abuse of discretion to determine that [appellant] is required to continue working at a job which would have continued exerting excessive stress. . . ." Appellant also observes that Ms. Durkee failed to present evidence "that any long term sales opportunities existed" for him. He asserts:

Even if such jobs were available, it is inappropriate under the facts of this situation to require Michael to seek employment in a field that did not work for him according to both

parties. No testimony was presented that Michael's decision to be self-employed was not ultimately the correct decision. This Court can take judicial notice of the economy and is certainly aware of the market downturn and massive layoffs in technology since March of 2000.

\* \* \*

The Chancellor's findings of fact did not fault Michael for his decision to build his own business, nor did he find that the termination of employment was due to any fault of Michael's.

It is well established that parents have an obligation to support their children. *Middleton v. Middleton,* 329 Md. 627, 633, 620 A.2d 1363 (1993); *Sczudlo v. Berry,* 129 Md.App. 529, 542, 743 A.2d 268 (1999); *Goldberger v. Goldberger,* 96 Md.App. 313, 323, 624 A.2d 1328, *cert. denied,* 332 Md. 453, 632 A.2d 150 (1993). Title 12 of the Family Law Article of the Maryland Code sets forth a comprehensive scheme with regard to parental child support. To calculate the parents' financial obligations under the child support guidelines, the court must consider "the actual adjusted income" of each parent. *Reuter v. Reuter,* 102 Md.App. 212, 221, 649 A.2d 24 (1994); *see Harbom v. Harbom,* 134 Md.App. 430, 460, 760 A.2d 272 (2000); F.L. § 12–204(a)(1). In doing so, the court must ascertain the parties' "actual income," which is defined as "income from any source." F.L. § 12–201(c)(1).

A parent is voluntarily impoverished " 'whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources.' " *Digges,* 126 Md.App. at 381, 730 A.2d 202 (quoting *Goldberger,* 96 Md.App. at 327, 624 A.2d 1328). In *Wills v. Jones,* 340 Md. 480, 494, 667 A.2d 331 (1995), the Court of Appeals said that "voluntary" means that "the action [must] be both an exercise of unconstrained free will and that the act be intentional." A parent is not excused from support because of a tolerance of or a desire for a frugal lifestyle. *Moore v. Tseronis,* 106 Md.App. 275, 282, 664 A.2d 427 (1995). Indeed, if need be, the parent must alter

his or her previously chosen lifestyle to satisfy a support obligation. *Sczudlo*, 129 Md.App. at 542, 743 A.2d 268.

■ In a case involving a claim of voluntary impoverishment, a trial court must find voluntary impoverishment in order to impute income to that parent for purposes of calculating child support. *See John O. v. Jane O.*, 90 Md.App. 406, 601 A.2d 149 (1992). In *John O.*, the circuit court found that the father was capable of employment and "projected [his] potential earning capacity" to compute his child support obligation. *Id.* at 419, 601 A.2d 149. But, the court "failed to make a specific finding that he was voluntarily impoverished." *Id.* As a result, we remanded for the circuit court to review the facts and determine whether the father was voluntarily impoverished. *Id.* at 423, 601 A.2d 149.

More recently, in *Dunlap v. Fiorenza*, 128 Md.App. 357, 738 A.2d 312, *cert. denied*, 357 Md. 191, 742 A.2d 520 (1999), we considered a mother's contention that the trial court erred in attributing income to her for purposes of calculating child support, because it did not explicitly find that she was voluntarily impoverished. We rejected that claim and upheld the trial court's implicit determination of voluntary impoverishment, noting further that the record provided "adequate support" for such a determination. *Id.* at 365, 738 A.2d 312.

■ To determine if a parent is "voluntarily impoverished," the chancellor should consider several factors, including:

"1. his or her current physical condition;

2. his or her respective level of education;

3. the timing of any change in employment or financial circumstances relative to the divorce proceedings;

4. the relationship of the parties prior to the divorce proceedings;

5. his or her efforts to find and retain employment;

6. his or her efforts to secure retraining if that is needed;

7. whether he or she has ever withheld support;

8. his or her past work history;

9. the area in which the parties live and the status of the job market there; and

10. any other considerations presented by either party."

*Goldberger,* 96 Md.App. at 327, 624 A.2d 1328 (quoting *Jane O.,* 90 Md.App. at 422, 601 A.2d 149); *see Moore v. Tseronis,* 106 Md.App. at 282–83, 664 A.2d 427.

■■■ Once a court determines that a parent has become voluntarily impoverished, the court must determine the amount of "potential income" to attribute to that parent, in order to calculate support under F.L. § 12–204. *Goldberger,* 96 Md.App. at 327, 624 A.2d 1328; *see Wills v. Jones,* 340 Md. at 490, 667 A.2d 331; *Wagner v. Wagner,* 109 Md.App. 1, 42–43, 674 A.2d 1, *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996); *Reuter v. Reuter,* 102 Md.App. at 221, 649 A.2d 24.

Under F.L. § 12–201(b) "income" is defined as:

(1) actual income of a parent, if the parent is employed to full capacity; or

(2) *potential income of a parent,* if the parent is voluntarily impoverished.

(Emphasis added). *See Wagner,* 109 Md.App. at 42–43, 674 A.2d 1.

F.L. § 12–201(f) defines potential income as follows:

*Potential income.* "Potential income" means income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community.

■■■ In determining a parent's potential income, the trial court must consider the following factors:

1. age

2. mental and physical condition

3. assets

4. educational background, special training or skills

5. prior earnings

6. efforts to find and retain employment

7. the status of the job market in the area where the parent lives

8. actual income from any source

9. any other factor bearing on the parent's ability to obtain funds for child support.

*Goldberger,* 96 Md.App. at 328, 624 A.2d 1328; *see Digges,* 126 Md.App. at 383–84, 730 A.2d 202.

██ Our review of the record reflects that the court considered the evidence and the factors relevant to the issue of voluntary impoverishment. The court observed that appellee's income was minimal, and also found that appellant had "infinite potential to earn." Further, the court heard testimony indicating that appellant's effort to establish his own business was rather limited. Indeed, during the time appellant was trying to establish his business, he took skiing, horseback riding, and flying lessons. Thus, the court concluded that, given appellant's decision to become self-employed, "Mr. Durkee has not achieved his full potential." Consequently, the court imputed income to appellant for child support purposes.

██ As appellant points out, however, the court did not make an express finding of voluntary impoverishment. But, a trial court does not have to follow a script. Indeed, the judge is "presumed to know the law, and is presumed to have performed his duties properly." *Lapides v. Lapides,* 50 Md. App. 248, 252, 437 A.2d 251 (1981); *see Dunlap,* 128 Md.App. at 365, 738 A.2d 312. Here, as in *Dunlap,* the court implicitly found that appellant had voluntarily impoverished himself, and the record supports that finding. Nevertheless, as a practical matter, we decline to resolve whether the court's finding was deficient, given our decision to remand with respect to the alimony issue. Accordingly, on remand, the court should articulate its precise finding as to the issue of voluntary impoverishment. For the benefit of the court on remand, we shall briefly address appellant's other contentions as to voluntary impoverishment.

Appellant claims that voluntary impoverishment cannot occur if the trial court erred because his decline in income first occurred during the marriage, or if the court fails to find that the parent deliberately sought to impoverish himself or herself with the purpose of depriving the family of support. We disagree.

In *Wills,* 340 Md. 480, 667 A.2d 331, the Court recognized that parents who impoverish themselves for reasons unrelated to avoidance of their existing child support obligations nonetheless fall within the class of persons for whom income can be imputed in accordance with the factors outlined above. Moreover, we have not been provided with any authority for the proposition that a court may not find voluntary impoverishment unless the decline in income occurs after the separation.

Certainly, there are many instances when a spouse suffers a decline in earnings during the marriage, for any number of reasons, and that circumstance may contribute to the break up of the marriage. We see no reason why a court could not find voluntary impoverishment, based on the appropriate criteria set forth above, merely because a spouse happens to experience a reduction of income prior to separation. If appellant were correct, it would mean that the spouse in need of support would jeopardize that support by remaining with the obligor spouse in an attempt to save the marriage, or to encourage that spouse to become more financially productive. Under appellant's analysis, even a brief willingness by the payee spouse to tolerate a reduction in income would affect the court's later ability to find voluntary impoverishment. We reject that view.

Further, the court was entitled to consider appellant's prior employment and education in calculating his potential income. *See Sczudlo,* 129 Md.App. at 544, 743 A.2d 268. Here, the testimony showed, and the court was entitled to find, that appellant had earned an average income in excess of $93,000 for 1995, 1996, and 1997. After appellant lost his job in early 1998, however, he chose not to seek outside employment, despite his education, skills, experience, and prior employ-

ment, and his acknowledgment that there were job openings in his field. As we said in *Sczudlo*, 129 Md.App. at 544, 743 A.2d 268, "[t]his certainly was his prerogative, but not at the expense of his children." Indeed, because appellant was "perfectly employable," *id.*, from the time he lost his job in 1998 through the date of the hearing, the court was clearly justified in imputing income to him for purposes of calculating his child support obligation. *Id.*

In the case of *In re Joshua W.*, 94 Md.App. 486, 617 A.2d 1154 (1993), an impoverished parent was a graduate student at the time of trial. Prior to his graduate studies, however, the parent had worked as a car salesman, a pastor, and a writer. We declined to limit our determination of the parent's earning potential to his earnings as a graduate student. Similarly, we perceive no error in the amount of income attributed to appellant.

To be sure, "any determination of 'potential income' must necessarily involve a degree of speculation." *Reuter*, 102 Md.App. at 223, 649 A.2d 24. A parent's potential income "is not the type of fact which is capable of being 'verified,' through documentation or otherwise." *Id.* at 224, 649 A.2d 24. But, so long as the factual findings are not clearly erroneous, "the amount calculated is 'realistic', and the figure is not so unreasonably high or low as to amount to abuse of discretion, the court's ruling may not be disturbed." *Id.* at 223, 649 A.2d 24 (internal citation omitted); *see also Schwartz v. Wagner*, 116 Md.App. 720, 724, 698 A.2d 1222 (1997); *Reuter*, 102 Md.App. at 221, 649 A.2d 24; *Goldberger*, 96 Md.App. at 327–28, 624 A.2d 1328.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS; COSTS TO BE PAID 50% BY APPELLANT, 50% BY APPELLEE.**